The next case on our oral argument calendar is Katherine G. v. Kentfield School District. You may begin whenever you're ready. I'm sorry, Your Honor? You may begin whenever you're ready. Thank you, Your Honor. Good morning, and thank you for the opportunity to speak before the Court. Bob Varma representing Katherine G. Your Honor, this case concerns the least restrictive environment and a disabled child's access to that environment. That is the fundamental issue before this Court. This is a child that had the ability and the skills to be in regular education, and under the basic floor of opportunity under Rowley, the child should have been allowed to be in regular education. Instead, what was proposed was a two-fold system where she would be in a disabled classroom during the morning and a regular education classroom in the afternoon. It is inconsistent with the position that she is so disabled that she requires more restrictive services to then put her in two classes each day with two sets of students, two different campuses, and expect her to be able to progress in that environment. What the evidence showed is that for the year that we are appealing, the 2000-2001 school year, the parents did place the child in a regular school. And while the hearing was going on, she had just been in that placement for about a month, I think, at that point. She was making progress towards her goals and objectives. And the hearing officer and the district court's position that we look at the state standards and what she's able to do with the state standards is inaccurate. What we look at under the IDEA are the goals and objectives of that particular child and whether that child is making progress towards those goals and objectives. I think the question is, do we start with the child in a disabled classroom and then think whether we can move her to a regular education classroom when we design the IEP? Or do we start with the concept of can we meet her goals and objectives in a regular education environment with supports and services? I think that is where the least restrictive environment requires us to start. And in this case, what has happened is the evidence showed that she could make progress in the least restrictive environment. However, the hearing officer did not do a complete Rachel H. test. He stopped at the first factor and did not weigh the other two factors. There were four factors total, but the last factor of cost was not an issue in this case. And when you weigh the three factors that are remaining, the factor of educational benefit in a more restrictive or a less restrictive environment, nonacademic benefit, and whether the child is disruptive to the classroom, Katie meets all three factors in the balancing test. But what if we agree with your argument that the hearing officer made a mistake in stopping at the first Rachel H. factor? Do we then, at this level, apply all of the factors and make a new determination? Yes, Your Honor. That would be the most simplest way to do it. It would be the least complex. However, the court can remand it, but that hearing officer is no longer with the hearing office, and I don't know how it would proceed at that point. But I think the ---- What if it went back to a different hearing officer? It could go back to a different hearing officer. They would have to review all the transcripts. But I think under the de novo principle, this court has the authority to do the weighing and the balancing. Oh, I'm sorry. I have a question about timing and how it is we ---- what lens we use to look through. And in particular, I have this question about the 1999-2000 year. Are we supposed to be looking at what was known or could be known at that time, at the time the IEP was being prepared, or do we look with hindsight? And the reason I ask is that at least it appears to me that the plan for 99-2000 may have been perfectly reasonable through the eyes of a person looking at it at the time it was prepared, and it's only in hindsight that it appears to have been inadequate. And I know you may not agree with that assessment, but just in terms of the theoretical question, do we look at what was known at the time the thing was prepared or do we look backwards in time? And if we remand, we're now several years later, we can look back and know what's happened to Katie and we can see whether it's worked or it hasn't worked, but is that really what the law is requiring? No, Your Honor. I think the law requires that we take a look at the time that we developed the IEP. That is correct. However, the law also requires that there be consideration and discussion of what placement the child should go in, and that is where we get into the concept of mainstreaming or least restrictive environments. And in Katie's case, for the 99-2000 school year, at the time that she started the school year, we may say, well, we don't know how she'll do in regular education, so we'll put her in the special day class. However, as the year progressed, and an IEP is a fluid document, and the parties can call an IEP at any time to change if the child is changing, the law anticipates that if the child is changing, that you call an IEP meeting and you address that issue. And in Katie's case, and the evidence is there, that the parent repeatedly talked to the staff at the school about her going to the ABC school, which was the after-school program, and how she was doing there and whether she needed support there. And the school staff, the teacher was aware of this placement, and I believe she even went out and saw the placement. I know that the psychologist and the speech therapist saw the placement during that school year. But the issue is, as the parent is reporting that my child is doing well there, I would like transportation or I would like aid support, the district should have at least called an IEP meeting to consider whether there should be partial mainstreaming. What stands out in this case is that the real motivation that was never done was because neither the county nor the district ran a public regular education preschool program. And because they would have had to pay for a private program, they did not call an IEP meeting to discuss that issue of whether this child should be mainstreamed. And that is what the hearing officer saw, and that was part of the reasoning for the hearing officer ruling in favor of Katie for that school year. Kennedy. Judge Graber's question is interesting, and your comments are interesting. As it turns out, the 99-2000, when Katie went to the ABC, ABC worked out well, according to what the hearing officer held, and has ruled that they should be reimbursed for the cost of that, because as it turned out, right or wrong, the school district decided not to mainstream. She was put on the outside, and it was a success. Now, if ABC would have failed, I don't know where we would be, because then you would be in a toss-up. Now we have an interesting situation with regard to 2000 and 2001, because Trinity evidence is not in. So I assume what's going to happen is because there's been a rejection by the parents of the dual path for 2000, 2001, because she went to Trinity, whatever decision we make, if you come back here in a year and say Trinity was a complete success, we're going to be continually doing this. And that's why Judge Graber's question is so interesting, because the school district could be saved by integrating everybody mainstream. They could just say, we're going to integrate them, and if it fails, just say, well, it didn't work. So I don't know how to approach this, because it's very easy to say for the school district, look, just integrate them, the law says you integrate them, and if it doesn't work, you're never going to get that balance, because all they're going to be doing is integrating them. That goes to your next question. How do you keep monitoring this to shift? You're seeming to say we shift constantly. How do you do that, and what was failed here? Your Honor, the issue with the Trinity evidence was that it was just becoming available at the time of the hearing. It's not complete. So for this record, we don't know what happened. Correct. And we did make a motion to the district court to supplement the record. The district court disallowed that motion, and one of the reasons why we made the motion was to show that it was correct. Now, this issue was addressed by the Supreme Court in Burlington when it stated that we cannot expect parents to sit by and sit there and either have the choice of the school district's program or no other program, and that is why we award reimbursement when the parent takes that risk, so to speak. But when the parent says, I reject this program because I don't believe it's going to work, and provides a private placement, and it does work, that's Burlington anticipates that. Well, aren't there going to be those situations in which what the school district offers is permissible, but still not to the parent's liking? And when that happens, I mean, I guess that's really the question here. Is one of the requirements that it be to the liking of the parents? The liking, it has to do with appropriateness, and there are cases in which parents keep their child in the school program while they still litigate the issue. But in this case, what the parents did was based upon the success that they saw at ABC, they wanted the full inclusion, and they went for the full inclusion. Well, being a parent and knowing people that have these situations, it's almost as though I'm hearing you say and almost where I would go to say, look, once the school district offers me the option and I don't feel good about it, I should pay my money and do it, because if I do it and it's successful, I'm going to get repaid. What's the harm and foul in that? Because if you're interested in your child, the first thing I would do is say, look, you're not accommodating what I know about my child, so you go out and do it, and the remedy is exactly what you want, and that is, in this case, ABC gets paid according to the hearing officers. Trini's out at this point for this record, is out, and may or may not be in the same situation. So it seems as though you're saying that go ahead, school district, do what you want to do, but as a parent, I have a right to make my decision, and I will write on that based upon whether it costs me or it's going to cost you, because I've got my child's interest at stake. Is that what you're saying? That's correct, Your Honor, and that's what the law allows, that the parent does have the choice to reject the district's offered placement and do another placement and then have the issue litigated. What is, what stands out about this case is that the parent, you know, in hindsight, maybe the parent should have waited after the whole school year of 2000, 2001 to bring the lawsuit, but we can't expect, and that's where it gets a little bit muddy, in that we can't expect parents who are trying to get that placement in the public school. They didn't want the private placement. They chose it because they weren't given the public school placement. Well, let's follow down the road. Let's assume that we have these various tensions relative to the interest, because the interest of the parent can't be equated to the interest of the school. I mean, it's impossible. So if you make your choices and if you file the lawsuit now, are you saying that if we don't follow 2000 and 2001 and seek that they were wrong, that you're not going to be prevented from getting your ultimate remedy on Trinity if you could, or if you could have had your evidence in, that you should be reimbursed for Trinity? Are we cutting you off? Is that what you're saying? That's, I think what has happened in this case is that the case has been cut off in the sense that it was brought at the time. But you brought the case. See, the school district didn't do this. If, in fact, the theory is that we're going to take the various interests and then seek our various interests, and if someone's wrong, someone's going to pay, then you brought the lawsuit at the wrong time. Because I'm going down that road with you, but I'm trying to figure out what do I do about 2000 and 2001, because I don't have the full picture in the cycle that we've been describing. On another issue, I'm running into my rebuttal time, but to answer Your Honor's question, we brought the case at the time because the case was ripe with respect to the 99-2000, and they had made an offer of placement for 2000-2001. It's our position that the evidence was there, that there was evidence to support that this child should have been in regular education. And that's the 99-2000 school year evidence, which showed that she was making progress in a regular education placement. And the little bit of Trinity evidence that we did have, because there was testimony from one of the staff that worked at Trinity, and one of the experts who had observed her there, that she was making progress towards her goals and objectives. I want to know how you balance the academic versus the non-academic benefit, because Mrs. Yorman and Dr. Peterson said that Katie would do very well academically in this segregated situation in 2000-2001. How do you balance that against whatever benefit she would get from mainstreaming, non-academic benefit from mainstreaming? You're talking about two different things. I think we start at the principle of is there a way to put her in regular education and still provide her the support that she needs to function academically, if that is such a huge concern on Ms. Yorman's part and Dr. Peterson's part, who had never seen her. And the issue comes up, and I think in this case, the Rachel H. case is actually factually similar, is that in Rachel's case, they were pulling her out for those support services. In this case, the district never considered such a program of what if we have her in regular education and pull her out for that time that she needs academic. It was all or nothing, you're either going to go full-time in this special education placement, and then you can go to regular education, or you can do what your parents want. There wasn't a choice, there wasn't a plan to have her in least restrictive environment and yet provide her the pull-out or in-class service that she might need. So once we look at that, then we question what educational benefit could she get in regular education, and then we balance the factors, and what I think comes out is that given the kindergarten curriculum and what was expected of her, and there was testimony on this issue as well, she was already doing many of the things that kindergartners did. And so if she's academically able to function the way that they are, that the typical students are, then why should she not be in regular education? That's how we balance the factors, and then we also have to take into account the non-academic, which for her was a huge issue, the social models that she would have in regular education. That was one of the big issues for this child. You have exceeded your time, but I'll give you some more for rebuttal, because you've asked a lot of questions. Ms. Tomski. Good morning. May it please the Court, my name is Jan Tomski, I'm with Lozano-Smith, and I represent both defendants, the Kent Field School District and the Marin County Office of Education. I think I'd like to touch upon a few of the questions that were asked of Mr. Varma, and specifically referring back to the notion about, you know, do we look at this with a lens that's retrospective, or are school districts' decisions to be judged based on the information that it had at the time? And Adams v. Oregon has made very clear to us that the appropriate analysis is, in fact, the information that was available to the school district at the time that it made its decision. And with respect to the 1999-2000 school year, we had an assessment that had been conducted for the child, we had a teacher, both a credentialed teacher and also a language pathologist, who had worked with the child for a full year at that point, and the team came together and looked at the program that was appropriate for this child who was functioning well below her chronological peers, particularly with respect to her language functioning. And a considered decision was made at that time, an assessment-based decision, a decision by the educational team, that what she required in order to ultimately access an academic program with her peers, because that was clearly the goal, that is always the goal, was an intensive program in order to teach her the language skills that she needed in order to access curriculum. She did not have them. And every educational academic... Let me ask you what our role is in relation to the role of these experts. The testing that was done in 1999, there were varying tests that showed varying equivalent ages. She was almost 4 1⁄2, and the testing was anywhere from 2 1⁄2 to almost 4. Depending on the specific item. How are we supposed to figure out whether a child with that chronological age and that developmental age would benefit from playing with other children of the same chronological age? Well, in truth, I think that what the courts have clearly said is that it's the role of the court in reviewing a decision like this to give deference to the educational decision-makers and their interpretation of the data. We're not asking you, and the case doesn't ask you, to make your own independent educational decisions. Where the decisions were made, where they're sound, where they were in evidence, and here we had not only the educators working with the child concluding from the data that Katie in 1999-2000 was not appropriately mainstream. What is your response to Mr. Varma's argument that the flaw in 1999 and 2000 was a procedural kind of flaw, that is, failing to consider partial mainstreaming, failing to meet, failing to do the things that would have given better information about whether mainstreaming would have helped her? Well, it's a puzzle that that argument persists, because the evidence that's in the documentary evidence for the case for sure clarifies that, in fact, that was a discussion that occurred at the May 1999 IEP, that there was discussion about participation with general education peers, and Mrs. Glosser herself testified that we discussed it. There was a discussion along those lines. There always is. But it's interesting, because when you're looking at a preschool year, there is a bit of a difference between that and a kindergarten year, where the child would fundamentally be in general education, and we'd be looking to support that child and only remove the child if it could be done appropriately. In a preschool year, as both the hearing officer and the court following the hearing officer analyzed that issue, it's not so much looking at removing a child from general ed, there is no general ed in preschool. It's looking at whether Katie required access to typically developing peers in order to progress. And looking at what did occur, and the hearing officer was characterized as an inferential leap, and then the court took the same sort of intuitive leap that, well, looking back, she progressed in that program. So while the court criticized the hearing officer for making that inferential leap and said, in fact, there was no evidence that she required that kind of a placement to benefit from her program, the court itself then said, but intuitively, she progressed there, so we believe she must have required that in order to meet her unique needs. The truth is, in reviewing the evidence, there was no evidence that Katie was truly benefiting from that program. They observed her ______. You're talking about ABC? Which was a daycare. Okay. Correct. And they observed that she was doing better in that program. There's no way to know whether that may well have been because of the intensive facilitated services she was receiving at the same time through the district. Well, I'm now where Judge Graber was. I don't know how to interpret all this, because we're receiving information from what looks like at least two or three different elements. First of all, the ABC people, and I want to be careful how I say this, the ABC people are private people being paid to do certain services. And so I don't see them coming up and saying, gee, we failed everything. We can't do anything with this girl. They seem to have pretty glowing or affirmative things about what their program does, and I would expect that to be unless there was some contrary evidence, which I don't know there was. You're saying that because there were other services, it enhanced the ABC. How do we sort all this out? In other words, you're saying we should defer. Okay, we deferred, and the hearing officer said they should be paid for ABC. But you're saying they shouldn't be paid for ABC. Well, again, and I appreciate the dilemma. See, we're two levels out, and they're also saying that the district court erred because it never went beyond step one of Rachel Ayes. Here we're sitting two levels out. How are we supposed to look in all the way and defer to the hearing officer? And if so, hearing officer said give ABC the money or give the money for ABC. But the hearing officer's decision in that regard and also the district court were fundamentally flawed in that neither the hearing officer's decision nor the court's was based on the evidence. The hearing officer made an inferential leap. That's what the court said. And then the court said intuitively. The truth is, looking at it, children was ñ I think the intuition comes from the notion that we believe that if children with disabilities are with children who are not, they will benefit, they'll model their behavior, they'll learn language, they'll progress. The fact is that children with disabilities are different. That's why we have special education. That's why we provide specialized instruction to allow children to progress. They don't learn naturally. And I would bring the court's attention to the Berger v. Medina city schools case. This is a Sixth Circuit case from last year. And in that case, the court said when you're confronted with this kind of an issue, you're looking back. Should that have been offered? Do you reimburse? The court said in looking at reimbursement, evidence of progress alone is not sufficient. The law requires that the placement for which reimbursement is sought must be an appropriate placement within the meaning of special education law. So where a placement provides no special education support, no specialized instruction, reimbursement is not warranted. Are you saying it's sort of a feel-good situation here? You're saying that the error was made because ABC said, gee, we're seeing all these wonderful things. What they were seeing were not things that are covered by the statute. You're hiding behind ñ not hiding, excuse me. You're standing behind the statutory interpretation and purpose and saying, gee, that was wonderful what you were doing in daycare, but that's not what the statute's all about relative to reimbursement. Is that what you're saying? I guess I would go even one step back from that and say there wasn't evidence that the ABC people came to the table and testified that she was doing wonderfully. In fact, in the spring of 2000, they were asking for support. And in fact, Eileen Lee, the parents' expert, said she went and saw Katie. She was alone. She was not being facilitated. She was being managed. It was daycare. There were no educational expectations. She wasn't acting out. She was doing okay in the daycare. You've got me right where I have the problem. We've heard many of these cases over the years, and typically speaking, there are various private institutions which offer hope to parents that are not, using your term, I guess, educational, but they're daycares or whatever. And maybe the children do feel better and maybe the parents do feel better. Are you trying to say even if that evidence is there, that your evidence on the statutory educational side carries the day because the other evidence does not satisfy the statute relative to reimbursement? I'm saying all of those things. I'm saying if you examine the district's offer at the time it was made, it was appropriate. They believed the child would have access to typically developing peers in the day class setting where her instruction could be intensive and facilitated. Second, the parent gave no notice that she was placing the child there. It was, by all evidence that was in the record, just a daycare placement. She didn't intend it to be a mainstream placement for her child because that was being denied. She didn't raise that issue. She didn't ask for a mainstream placement. She never gave districts a notice that it was merely a placement for the child's daycare. Does that go into Judge Hall's question about the academic and nonacademic benefits of mainstreaming? It does to some extent because, and it certainly is relevant with respect to why I believe the Berger court said unless you can demonstrate that that placement actually provided specialized instruction, special education was appropriate within the meaning of IDEA law, that we don't provide reimbursement for such placements. And this is a prime example of a placement that had nothing to do with a disagreement with the district. There wasn't one voiced. There wasn't one asserted. There wasn't any notice. It was after the fact when really what was at issue was the district's offer for 2000-2001. And in that regard, I will note that I believe it is certainly our opinion. It had been our opinion all the way down to the hearing office level that Mr. Varma is absolutely correct when one is looking at an inclusive placement. The Rachel H. factors are the relevant factors. Kula, though this Court's decision that followed that, did note, strongly suggest, as the district court noted, that if there is no educational benefit, the other factors are to some extent irrelevant. I had a question about that, because I don't want to quibble too semantically about this, but the people testifying were hesitant to say that there was no educational benefit that could be foreseen from a normal kindergarten placement. I think they said there might not be a lot of benefit, but they didn't really say that there would be no benefit. So taking what I'm saying, how does that change the analysis? That wouldn't be my characterization of the witness testimony. There may be some who said that. Dr. Patterson was certainly the expert of the district, and he said not only would Katie not receive academic benefit, but she would regress if she were placed in that placement. He was very clear and very overt about his opinion with regard to that. Laura Trahan, Clara Yorman, they were very concerned, which is indeed the only reason that this case did go forward, that it would be a cruel thing to do to Katie, that, indeed, she simply did not have the skills to benefit from instruction at all in that setting. And while she might benefit in other ways, she would not receive educational benefit. And certainly Rowley, going way back, instructed us that fundamental to faith is the ability to gain educational benefit. So there was much discussion, two IEP meetings, many hours, reviewing every goal and objective, how can we implement this in the least restrictive environment, which is how the district created the placement that actually offered Katie the best of both worlds, a specialized placement and a general kindergarten placement where she could work during centers and on social skills. It remains our opinion that POOLA should be interpreted to say that where there is no educational benefit, which we did believe, certainly our expert and our other witnesses testified and believed, that in that case the child's fundamental primary classroom setting can't be a full inclusion setting. Katie was moving along the continuum. It was clearly the hope and expectation and goal of every dedicated member of her team that ultimately she would be able to be included. But doing that as an experiment or doing that because, you know, it certainly resonated with me, Judge Vernetti, that that is the best legally defensible thing to do, put the child in, demonstrate that it won't work, and go on from there. But the case went forward because the educators on the team absolutely could not allow that to happen to Katie. That's how we got where we were, because they believed they needed to advocate for Katie. So the case went forward. And, again, when one is, I go back one more time to the daycare setting, and, again, I urge the court to consider Adams v. Oregon and what the district was looking at at the time they made the placement. I also, again, I believe that the testimony has been somewhat inflated, mischaracterized, perhaps over the course of the briefing with respect to what a wonderful placement everybody believed that was. It was not a placement. It was not educational. It provided no specialized support for Katie. The individuals who worked with her were individuals with community college experience, and they're undoubtedly wonderful daycare providers, but they're not educators. They don't understand special education needs. They didn't know what Katie's goals and objectives were, much less can there be any plausible argument that they were being met in that setting. Thank you, counsel. Thank you. Mr. Verma, we used up your time with some questions, I think, so we'll give you two minutes for rebuttal. Thank you, Your Honor. I would like to start with the first point that I want to make is that, once again, the district is asserting that the people at ABC were not educators, and the truth of the matter is Ms. Stevens was a credentialed teacher. There are some points that I want to cover very quickly in rebuttal. The point is raised that Katie was testing well below her Pearson language skills. Rachel H. was well below her Pearson academic skills, yet we put her in regular education. The testing showed, as Your Honor pointed out, there were varying skill levels. That is the autistic child. The autistic child has varying skill levels. That's how they're going to present. Language and social needs are their biggest needs. One of the great things that the regular education placement would do for Katie is meet her social needs of modeling appropriate social behavior. It would also give her language, but with typical peers, in modeling language. So I think it met both of those. One of the things that I think is happening in this case is educational benefit is being equated with academic benefit by the district, and I respectfully disagree. Educational benefit, especially for a child as young as Katie, is a total benefit of everything, learning how to play with her peers, taking turns, participating in projects. It's not just learning the ABCs and the numbers, which she was doing. And the point that was made about the ABC people presenting a glowing picture that counsel made, that's not correct. Ms. Stevens testified that when Katie first started at ABC, she was struggling. She made progress over that year, and the evidence bears that out. Their own psychologist went and assessed Katie's program at ABC and wrote a report saying, this child is doing wonderful here. So there is evidence that she was. Much of that is credited to what she was getting at school as opposed to just the ABC. Well, we could take that view and say how much of it is credited, and I think what we have to look at is in the school program, she didn't know how to interact with typical peers. That she learned at ABC. Language, yes, she was getting intensive language needs met, and that probably did help. But that's what the law says, is you don't just look at intensive services, you also look at what the benefits would be for mainstreaming. And that was the piece missing in 99-2000, that you have the intensive services you're providing. That is good, that is appropriate. But you also need to consider whether mainstreaming will help this child. And in this case, the mainstreaming would have helped and did help in that she did get to learn social skills and play skills with typical peers. She modeled them. And at the beginning, she didn't know how to do that. Ms. Stevens had to interfere all the time and intervene. And by the time the school year was over, she was negotiating for herself, turn-taking things and other issues with other children. That's something that she learned at the ABC school. Thank you, counsel. Thank you. We appreciate the arguments of both parties. They've been very helpful. And the case just argued is submitted. Excuse me. Don't we sound great? Yeah, we're just twins. The asthma twins up here. Yeah. You can't catch it even if you were closer. No, that's true. The last case on the morning count is CB versus Securities and Exchange Commission.
judges: Hall, Brunetti, Fisher